MISSISSIPPI RIVER FUEL CORPORATION, William G. Marbury, Glenn W. Clark, D. B. Jenks, Sam B. Cook, James Lee Johnson, C. D. Peet, John C. Bolinger, Jr., James M. Kemper, Jr., and Missouri Pacific Railroad Company, Appellants,

v.

Rose SLAYTON, Joseph M. Proskauer, Walter Mendelson, Alfred L. Rose and Dorothy B. Rose: Alleghany Corporation, and Empire Trust Company, a Corporation, as Voting Trustee, and Betty Levin, Appellees.

No. 17836.

United States Court of Appeals
Eighth Circuit.

April 19, 1966.

R. H. McRoberts, of Bryan, Cave, Mc-Pheeters & McRoberts, St. Louis, Mo., Thomas S. McPheeters, Jr., and Marion S. Francis, St. Louis, Mo., and John H. Hendren, of Hendren & Andrae, Jefferson City, Mo., for all appellants except Missouri Pac. R. Co.

Thomas J. Guilfoil, of Guilfoil, Caruthurs, Symington, Montrey & Petzall, St. Louis, Mo., Stuart Symington, Jr., and Gerald M. Smith and Mark M. Hennelly and Gilbert Strelinger, St. Louis, Mo., for Missouri Pac. R. Co.

Abraham L. Pomerantz, of Pomerantz, Levy, Haudek & Block, New York City, William E. Haudek, New York City, and Harold C. Ackert, of Ackert, Giesecke & Thompkins, St. Louis, Mo., for appellees Rose Slayton, Joseph M. Proskauer, Walter Mendelson, Alfred L. Rose and Dorothy B. Rose.

Walter R. Mansfield, of Donovan, Leisure, Newton & Irvine, New York City, Granville Whittelsey, Jr., Mahlon F. Perkins, Jr., and Ben Vinar, New York City, and G. Carroll Stribling, of Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, Mo., for appellees Alleghany Corp. and Empire Trust Co.

John Lowenthal, New York City, Roberts P. Elam, St. Louis, Mo., and Maxwell Brandwen, of Szold, Brandwen, Meyers, Blumberg, & Altman, New York City, for appellee Betty Levin.

Before VAN OOSTERHOUT, BLACKMUN, and MEHAFFY, Circuit Judges.

BLACKMUN, Circuit Judge.

This litigation is a chapter in the struggle between the holders of the respective majorities of the two classes of outstanding shares of the Missouri Pacific Railroad Company (MoPac).

The district court has denied defense motions to dismiss complaints in three separate diversity actions instituted by certain Class B shareholders of MoPac. The court's ruling was one restricted to the declaratory issue of the necessity of voting by classes on a proposed plan of consolidation of railroads. Decision on all other questions was reserved. Slayton v. Missouri Pac. R. R., 233 F.Supp. 747 (E.D. Mo. 1964). The trial court has certified the matter under 28 U.S.C. § 1292(b) and this court has permitted the appeals from the interlocutory order. Further proceedings have been stayed.

MoPac, a Missouri corporation and an interstate common carrier by railroad, emerged as of January 1, 1955, from reorganization proceedings which had been pending under § 77 of the Bankruptcy Act, 11 U.S.C. § 205, for more than 22 years. See Missouri Pac. R. R. Reorganization, 290 I.C.C. 477 (1954); In re Missouri Pac. R. R., 129 F.Supp. 392 (E.D. Mo. 1955), aff'd sub nom. Missouri Pac. R. R. 5¼% S.S.B.C. v. Thompson, 225 F.2d 761 (8 Cir. 1955), cert. denied 350 U.S. 959, 76 S.Ct. 347, 100 L.Ed. 833; In re Missouri Pac. R. R., 135 F.Supp. 102 (E.D. Mo. 1955), aff'd sub nom. Missouri Pac. R. R. 5¼% S.S.B.C. v. Thompson, 229 F.2d 898 (8 Cir. 1956). It so emerged without preferred stock but with two classes of $100 stated capital no par voting common: Class A, which is preferentially entitled to noncumulative dividends of not to exceed $5 per share per year, and, upon liquidation or dissolution, to $100 per share plus declared but unpaid dividends; and Class B, as to which earnings and equity in excess of the Class A preferences are available. The Class A shares replaced MoPac's old preferred and accumulated dividends thereon and the Class B shares replaced MoPac's old common.

Among the well-pleaded facts alleged in one or more of the three complaints and therefore, for purposes of these motions to dismiss, to be accepted as true, Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Bonnot v. Congress of Independent Unions,

331 F.2d 355, 357 (8 Cir. 1964), are the following:

a. MoPac has outstanding 1,849,576 shares of Class A stock and 39,731 shares of Class B stock.

b. The Texas and Pacific Railway Company (T & P) was incorporated by Act of Congress in 1871 and is an interstate common carrier by railroad. It has outstanding 445,464 shares of one class of stock. MoPac owns 369,111, or 82.86%, of these shares.

c. Mississippi River Fuel Corporation (Mississippi) is a Delaware corporation. It began acquiring MoPac Class A stock in 1959. It now owns in excess of 1,071,-895, or 57.95%, of the Class A shares.

d. Alleghany Corporation (Alleghany) is a Maryland corporation. Since 1958 it has owned beneficially in excess of 20,500 or 51%, of the Class B shares of MoPac. This holding is subject to a voting trust agreement between Alleghany and Empire Trust Company, a New York corporation, as voting trustee.

e. The individual plaintiffs, totaling six in the three suits, own the following amounts of MoPac's Class B shares: Rose Slayton, not stated (but presumably 10 shares); Joseph M. Proskauer, 100; Walter Mendelson, 50; Alfred L. Rose, 50; Dorothy B. Rose, 50; Betty Levin, 85.

f. Most of the named individual defendants are the present directors of MoPac. Some of them are also directors and officers of Mississippi and of T&P. Neither Mississippi nor any of the individual defendants, with one exception, owns any of MoPac's Class B shares.

g. Texas & Missouri Pacific Railroad Company (T&M) is a newly organized Delaware corporation. Its equity capital consists solely of $25 par common stock.

h. MoPac's Articles of Association provide, Article VII, Section D(4), that, except for restrictions specified in Section D(3), or as otherwise required by law, each share of Class A and each share of Class B "shall have the same voting power" and that the vote of the holders of any class of stock, as a class "shall not be required for any other action whatsoever * * * including any amendment to the Articles of Association". Section D(3), however, states that four kinds of corporate change shall not be effected without the consent of the record holders of a majority of the Class A shares and of a majority of the Class B shares. These are: (a) the issuance of additional shares; (b) the creation or issuance of any MoPac obligation or security convertible into or exchangeable for MoPac shares; (c) an alteration or change in "the preferences, qualifications, limitations, restrictions and special or relative rights of the Class A Stock or of the Class B Stock"; and (d) the amendment or elimination of any of the provisions of Section D(3). The exact language of these portions of the MoPac Articles is set forth in the margin.[1]

---

1. Article VII, Section D.

"(3) The Company shall not, without the consent, given in writing or by resolution adopted at a meeting duly called for that purpose, of the holders of record of at least a majority of the number of shares of the Class A Stock then outstanding and at least a majority of the number of shares of the Class B Stock then outstanding, (a) issue any shares of stock of the Company of any class now or hereafter authorized in addition to the shares authorized to be issued by the provisions of Section C of this Article VII, (b) create or issue any obligation or security of the Company convertible into or exchangeable for shares of stock of the Company of any class, (c) alter or change the preferences, qualifications, limitations, restrictions and special or relative rights of the Class A Stock or of the Class B Stock or (d) amend or eliminate any of the provisions of this paragraph (3).

"(4) Except as otherwise provided above in paragraph (3) of this Article VII, or as otherwise required by law, each share of Class A Stock and each shares of Class B Stock shall have the same voting power, and the vote of the holders of all or any portion of any class of stock, as a class, shall not be required for any other action whatsoever to be taken or authorized by the stockholders of the Company, including any amendment to the Articles of Association. * * * *"

i. In December 1963 the boards of directors of MoPac and T&P approved an "Agreement and Plan of Consolidation" which would effect the consolidation of MoPac and T&P into T&M as the surviving corporation. The plan provides that each share of MoPac, both Class A and Class B, shall be exchanged for four shares of T&M and that each share of T&P (other than those owned by MoPac) shall be exchanged for 4.8 shares of T&M.

j. MoPac's board announced that its Class B shareholders are not entitled to vote on the plan separately and apart from its Class A shareholders and that it intended to submit the plan only to the collective vote of Class A and Class B.

k. In January 1964 MoPac, T&P and T&M filed their joint application with the Interstate Commerce Commission for an order, under § 5(2) of the Interstate Commerce Act, 49 U.S.C. § 5(2), authorizing the proposed consolidation and, under § 20a, 49 U.S.C. § 20a, authorizing the issuance of securities by T&M. In this application MoPac stated that it intended to submit the proposed plan to its shareholders for approval, as contemplated by § 5(11) of the Act, 49 U.S.C. § 5(11), by May 1964 by the shareholders' collective vote.

We note parenthetically at this point that, while Mississippi owns the majority of MoPac's outstanding Class A shares and Alleghany beneficially owns the majority of MoPac's outstanding Class B shares, Mississippi obviously owns the majority of the total of Class A and Class B. We note further that, under the plan, the proposed one for four exchange of both Class A and Class B for T&M shares would result in the present Class B holdings being engulfed by the larger number of Class A holdings.

In 1963, after the boards' approvals of the plan but prior to its submission to the ICC, Class B shareholder Slayton instituted the first of the three suits with which this appeal is concerned. The four plaintiffs Proskauer, Mendelson, and Rose have been permitted to intervene in that suit. The action is one against MoPac, Mississippi, and twelve individual defendants. The complaint as amended alleges, among other things, that the plaintiffs bring the action on behalf of themselves, representatively on behalf of all other (approximately 1200) Class B shareholders of MoPac, and derivatively on behalf of MoPac itself; that since about 1960 Mississippi "did and it now does control MoPac, select and dominate its directors and principal executives and determine its policies and the conduct of its affairs"; that Mississippi acquired this control illegally; that the plan "is grossly unfair and inequitable" to the Class B shareholders; that the value of one Class B share is many times greater than the value of one Class A share; that the plan is "a fraudulent and manipulative device adopted by defendants to enhance the value of the Class A shares at the expense and to the detriment of the holders of the Class B shares"; that the proposed consolidation "serves no valid or legitimate business purpose" of MoPac; that the adoption of the plan by MoPac's board "results from the illegal exercise by Mississippi of its control over" MoPac; that the approval and consummation of the plan would cause irreparable injury to the Class B shareholders; and that the call of a MoPac shareholders' meeting to vote on the plan would cause irreparable loss and expense to MoPac. The prayer asks for damages and an injunction and also for a declaration that the Class B shareholders are entitled to vote on the plan separately and apart from the Class A shareholders.

The second action was instituted by Alleghany and Empire in February 1964. It names MoPac, Mississippi, and 12 individuals as defendants. The third action was instituted in the same month by plaintiff Levin on behalf of herself and all other Class B shareholders and derivatively on behalf of MoPac. It names as defendants Mississippi, MoPac, T&P, and 16 individuals. Generally, the allegations and prayers for relief in the complaints in these two suits are similar to those in the Slayton complaint. One or both of them, however, contains allegations to the effect that the pursuit of the plan before the ICC will irreparably damage the

Class B shareholders and effect a waste of the corporate assets of MoPac; that the class voting issue is one which lies within the jurisdiction of the district court and "not within either the purview or jurisdiction of the Interstate Commerce Commission"; and that the defendants are engaged in a course of conduct calculated to enrich themselves at the expense of the Class B shareholders. Each complaint raises the question whether approval of the plan is subject to class vote by MoPac and each requests, in addition to other relief, a declaration that the plan requires the approval of the holders of the majority of the outstanding Class B shares.

Motions to dismiss the respective complaints were filed. Submission of the plan to the MoPac shareholders was then deferred. The several motions assert, among other things, that (a) the district court is without jurisdiction to pass upon the merits of the plan or the lawfulness of submitting it to MoPac shareholders and to the ICC because sole jurisdiction as to this is exclusively in the ICC and the plaintiffs therefore have an adequate remedy under § 5 of the Interstate Commerce Act, and (b) the complaints on their face show that the holders of Class B shares are not entitled to vote separately on the plan.

The parties agreed to a limited consolidation of the cases for the hearing of motions. They also agreed that the court should first pass on the voting rights question. It was recognized that if the court decided that a favorable separate vote of the Class B shareholders was necessary for the approval of the plan, then, in view of Alleghany's stated specific opposition, other questions might not require decision. Accordingly, the district court directed its attention to this initial and particular issue.

The court held, pp. 749–752 of 233 F. Supp., that said Section D(3) of MoPac's Articles did prohibit "In plain language, * * * unless class voting is observed, company action" which alters or changes the relative rights of the two classes of stock; that the agreement to consolidate constitutes company action by MoPac; that under Missouri law, namely V.A.M.S. § 351.270, the voting requirements are controlled by MoPac's Articles; that, in addition, under § 5(11) of the Interstate Commerce Act, a carrier's authority to consolidate is conditioned; that the proposed consolidation here "seems so plainly and obviously to alter and change the preferences, qualifications, limitations, restrictions and special and relative rights of the Class A and the Class B shares as not to require discussion"; that the plan not only would change the present relative participation in equity but also would destroy the Class B shareholders' constantly accruing percentage increase of the total equity and fix their equity participation permanently at 2%; that the plan will result in the elimination of MoPac and the obliteration of Section D (3); and that it thus requires for approval a majority of the Class A shares and a majority of the Class B shares. In this posture the case comes to us.

We reverse.

We are concerned here with a proposed plan for consolidation of two interstate common carriers by railroad, MoPac and T&P, with the new T&M as the surviving corporation. This contemplated move is obviously subject to the provisions of the Interstate Commerce Act and particularly to § 5 thereof.

It seems evident, then, that our approach to the case must begin with the National Transportation Policy [2] enun-

2. "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act * * * to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate

ciated by Congress as part of the Transportation Act of 1940, 54 Stat. 898, 899, 49 U.S.C. preceding § 1.

The Supreme Court has stated that the policy "specifies in its terms that it is to govern the [Interstate Commerce] Commission in the administration and enforcement of all provisions of the Act, and this Court has made it clear that this policy is the yardstick by which the correctness of the Commission's actions will be measured". Schaffer Transp. Co. v. United States, 355 U.S. 83, 87–88, 78 S.Ct. 173, 176, 2 L.Ed.2d 117 (1957). The policy is therefore to be borne in mind, specifically, in connection with the federal statutes governing railroad consolidation. Those statutes, furthermore, have a significant and well-known history of their own which merits brief mention here.

At the conclusion of World War I, when the government was planning to return the country's railroads to private ownership, many smaller roads were financially weak and their survival was questionable. This prompted the Transportation Act of 1920, 41 Stat. 456, 481, by which Congress directed the ICC to take the initiative in developing a plan for the consolidation of American railroads "into a limited number of systems". There was, however, serious disagreement as to whether the Commission should be given the power to compel consolidation. In the end, the legislation provided that, although the Commission could promulgate a plan, it possessed no power to implement the plan. This, perhaps understandably, proved inadequate. The 1940 Act then relieved the Commission of its duty to provide a national consolidation plan. Initiation of mergers and consolidations remained, as before, in the hands of the carriers. "Thus, hostility to the consolidation of railroads except by the voluntary action of the merging roads has been

the undeviating policy of Congress since 1920". St. Joe Paper Co. v. Atlantic C. L. R. R., 347 U.S. 298, 305, 74 S.Ct. 574, 587, 98 L.Ed. 710, and appendix, pp. 315–321, 74 S.Ct. pp. 584–587 (1954); County of Marin v. United States, 356 U.S. 412, 417, 78 S.Ct. 880, 2 L.Ed.2d 879 (1958); Schwabacher v. United States, 334 U.S. 182, 191–193, 68 S.Ct. 958, 92 L.Ed. 1305 (1948).

Marin tells us that the purpose of the 1940 Act's "sweeping revision of § 5 * * * was to facilitate merger and consolidation in the national transportation system", p. 416 of 356 U.S., p. 883 of 78 S.Ct. And Schwabacher informs us that the tenor of prior Supreme Court decisions "was to confirm the power and duty of the Interstate Commerce Commission, regardless of state law, to control rate and capital structures, physical make-up and relations between carriers, in the light of the public interest"; that the 1940 Act authorized approval by the Commission of voluntary consolidation of the kind contemplated by § 5(2) (a) if it will be consistent with the public interest, if, subject to any modification made by the Commission, it is just and reasonable, and if there be assent of a "majority, unless a different vote is required under applicable State law, in which case the number so required shall assent, of the votes of the holders of the shares entitled to vote", § 5(2) (b) and (11); that "When these conditions have been complied with, the Commission-approved transaction goes into effect without need for invoking any approval under state authority"; that the Commission was given complete control of the capital structure to result from a merger; that the "jurisdiction of the Commission under both § 5 and § 20a is made plenary and exclusive and independent of all other state or federal authority"; that "the Commission must look for standards in passing on

---

with the several States and the duly authorized officials thereof * * * all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of

the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act * * * shall be administered and enforced with a view to carrying out the above declaration of policy."

a voluntary merger only to the Interstate Commerce Act"; and that rights of dissenting stockholders "are, as a matter of federal law, accorded recognition in the obligation of the Commission not to approve any plan which is not just and reasonable". Pp. 192, 194, 195, 197, 198, and 201 of 334 U.S., pp. 963, 965, 966, 967 and 968 of 68 S.Ct.

We necessarily assume that these pronouncements of the Supreme Court mean exactly what they say. We regard as significant the Court's emphasis on (a) the lodging of responsibility over railroad mergers in the Commission and not elsewhere; (b) the voluntary initiation by the carriers themselves of proposals for consolidation; and (c) the basic supremacy of federal law.[3]

We must recognize, too, that the merits or demerits and the fairness or unfairness of a proposed railroad consolidation are not, in the first instance, matters for our jurisdiction or our concern, or for the jurisdiction or concern of the district court. These are for the expertise of the Interstate Commerce Commission. The Act, both in § 5(11) and in § 20a(7), is specific. Commission action in this area is then subject to review by a three-judge district court, 28 U.S.C. §§ 2321–2325, with direct appeal to the Supreme Court, 28 U.S.C. § 1253.

There should be no argument as to this. The plaintiffs here do not really contend otherwise. Yet they devote substantial portions of their several briefs in expounding and protesting the proposed plan and its adverse and assertedly inequitable effects upon the Class B shareholders. We can sympathize, and we appreciate why the plaintiffs indulge in this approach. One observes readily what the proposed plan appears to do to the Class B holdings. See pp. 751–752 of 233 F.Supp. But we lay these aspects generally to one side because they bear primarily upon the plan's merit and thus constitute grist for the Commission and not, at this time, for the courts.

We conclude that the proposed consolidation and the plan for effectuating it are the very things which congressional policy has earmarked and preempted for the Commission, that jurisdiction over them normally and presumptively rests with that agency, and that anything contrarily indicated by state law or by state charter must give way except when clearly recognized by the Interstate Commerce Act itself. We therefore are relegated to consider here only whether there is anything in the Act, which, directly or by deference to MoPac's Articles or to Missouri law, prevents or affects the Commission's exercise of this jurisdiction.

1. The Interstate Commerce Act. Section 5(2) (a) provides that it shall be lawful, with the approval and authorization of the ICC, for two or more carriers to consolidate or merge. The section then goes on to outline the administrative procedures to be followed in achieving this end. Section 5(11) [4]

3. It is of interest to note that Mr. Justice Frankfurter, in speaking for the dissenters in Schwabacher, said, p. 205 of 334 U.S., p. 970 of 68 S.Ct.:
   "The Court now holds that State law governing the relations between State-chartered carriers and their stockholders is impliedly supplanted as to those who have refused to assent to a merger * * *."

4. § 5(11). "The authority conferred by this section shall be exclusive and plenary, and any carrier or corporation participating in or resulting from any transaction approved by the Commission thereunder, shall have full power (with the assent, in the case of a purchase and sale, a lease, a corporate consolidation, or a corporate merger, of a majority, unless a different vote is required under applicable State law, in which case the number so required shall assent, of the votes of the holders of the shares entitled to vote of the capital stock of such corporation at a regular meeting of such stockholders, the notice of such meeting to include such purpose, or at a special meeting thereof called for such purpose) to carry such transaction into effect and to own and operate any properties and exercise any control of franchises acquired through said transaction without invoking any approval under State authority; and any carriers or other corporations, and

grants the carrier full power, when the transaction is approved by the Commission, but with an important parenthetical restriction, "to carry such transaction into effect * * * without invoking any approval under State authority"; relieves the carriers from the operation of the antitrust laws "and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal" as may be necessary to enable them to carry into effect the Commission-approved transaction; and recites that any power given any carrier by the section "shall be deemed to be in addition to and in modification of its powers under its corporate charter or under the laws of any State".

This is broad and incisive language. We find nothing in the Act with respect to shareholder voting other than the parenthetical material in § 5(11). That material is the sole instance where the statute bows in the direction of state law.

What, then, does the statute's parenthetical language mean? And does it have application here? One immediately observes five phrases: (a) "a corporate consolidation", (b) "the assent * * * of a majority", (c) "unless a different vote", (d) is "required under applicable State law", and (e) "in which case the number so required shall assent".

▮ No one disputes that what is sought here is a factual consolidation of MoPac and T&P. The proposed transaction would seem to qualify, then, as something to which § 5(2) and (11) and Commission jurisdiction and the parenthetical phrase all have application. Plaintiff Levin argues, however, that whether a transaction is a consolidation at all with-

in the meaning of § 5(2) depends, wholly apart from its trappings, upon "essential character" or "primary objective". She cites *Marin*, supra, and Wood v. United States, 132 F.Supp. 586 (S.D.N.Y.1955), in support of this approach. In those cases the courts held transactions not to be within Commission jurisdiction. They did so, however, because of the form of the transaction itself and not because of intent or motive of the parties. *Marin*, for example, concerned a corporate division or split-up, not a consolidation; at pp. 418–419 of 356 U.S., at pp. 883–884 of 78 S.Ct. the Supreme Court expressly stated that the question of justification for the proposed transaction was not before it. We therefore are not persuaded by the Levin argument that motive of itself is a determinative factor in a transaction's qualification as a "corporate consolidation" within the language of § 5 (11). See Cleveland, C., C. & St. L. Ry. v. Jackson, 22 F.2d 509 (6 Cir. 1927).

Accepting the conclusion that the parenthetical material is applicable here, it is evident that the primary standard of application is a vote of the majority of all the voting shares. The statute speaks, in the first instance, "of a majority * * of the votes of the holders of the shares entitled to vote". Departure from this standard is, then, the exception and not the rule.

This takes us to the vital and determinative phrase, "required under applicable State law". State law in this case is Missouri's. A review of that law requires, first, a more detailed examination of MoPac's Articles.

2. MoPac's Articles. What, precisely, does Section D(3) and (4) mean and to

their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and they are relieved from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the

Commission, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction. Nothing in this section shall be construed to create or provide for the creation, directly or indirectly, of a Federal corporation, but any power granted by this section to any carrier or other corporation shall be deemed to be in addition to and in modification of its powers under its corporate charter or under the laws of any State."

what extent, if any, is it controlling here? The pertinent provisions of D(3) and (4) are quoted in footnote 1, supra. In requiring a vote by classes on the four specific matters the Articles state that "The Company shall not * * *". MoPac and Mississippi assert that this provision regulates only "internal" or "intracorporate" action and has no application to a consolidation. Thus, it is said, any alteration of dividend or liquidation rights of MoPac's shares or of the provisions of D(3), upon the adoption of the proposed plan, would result from the consolidation and not from action by "The Company".

There is other argument in support of a restrictive interpretation of D(3), namely, (a) that nowhere in D(3) is there any reference to merger or consolidation, that is, to external action; (b) that, nevertheless, merger and consolidation obviously were not overlooked by the draftsman of the Articles for these are contemplated by the National Transportation Policy, are frequent among railroads, were considered in the MoPac reorganization proceedings and, in fact, are mentioned in D(2); (c) that nowhere in the Articles are there protective provisions for any class of stock in the event of a merger or consolidation; (d) that D(4) establishes the denial of class voting as the rule and not as the exception; (e) that special preference is to be created only by clear and unambiguous language; (f) that this standard should not be weakened by implication, particularly when a consolidation, before it can be effectuated, must be found by the Commission to be just and reasonable and consistent with the public interest; (g) that the history of the MoPac reorganization discloses an initial conviction on the part of the Commission and the courts, continuing through the third plan, that the old common was valueless, see State of Texas v. Group of Institutional Investors, 191 F.2d 265, 273–274 (8 Cir. 1951), cert. denied 342 U.S. 904, 918, 72 S.Ct. 293, 364, 96 L.Ed. 676, 686 and 343 U.S. 929, 72 S.Ct. 757, 96 L.Ed. 1339, and that, with respect to the subsequently approved Agreed System Plan, the Commission refused to give the Class B stock even as much as 4% of the voting power and limited it to 2%; and (h) that it is inconceivable that it was intended to give a veto power over a consolidation to MoPac's old common shareholders, who had, at the most, only a "possible future equity", or, to put it another way, to give the veto to a bare majority, or perhaps even less, of 2% of the outstanding shares (in this case Alleghany alone), irrespective of how well the consolidation might serve the interests of the railroad, its creditors, and the public.

There is contrary argument. This is to the effect (a) that the proposed plan will indeed accomplish a change in "the preferences, qualifications, limitations, restrictions and special or relative rights" of the Class A and Class B shares, within the meaning of D(3); (b) that MoPac will necessarily be a participant for, although T&P and T&M also must act, the plan will not come about without the approval of MoPac's board and shareholders; (c) that, thus, there is company action; (d) that it is the end result, not the means, which is significant; (e) that the purported distinction between "internal" and "external" has no basis in the Articles and is arbitrary; (f) that were a consolidation to be excluded from the prohibitory language of D(3) it would have been expressly stated, just as it was in D(2); (g) that MoPac's old common shareholders received recognition in the reorganization, as finally consummated, not as a matter of grace but as a matter of right; (h) that any veto power they now possess came to them because it was fair and reasonable and because it was a recognition of rights normally accorded to equity owners; and (i) that the economic effect of the proposed plan is precisely the same as if there were an acquisition by MoPac of the properties of T&P and an issuance of MoPac stock to the minority shareholders of T&P, a procedure which, if directly pursued, would require Class B approval under D(3) (a).

These opposing points of view as to MoPac's Articles are not easily resolved. But MoPac's Articles do not stand alone. Hovering over them, as we have indicated, is § 5(11). Accordingly, we move on to the Missouri law and the Articles' posture within that law.

3. The Missouri law. We encounter at once the problem of determining what is "applicable State law" here. There are several possibilities:

a. V.A.M.S. ch. 388 is entitled "Railroad Corporations". Section 388.010 says the term "railroad corporation" means "all corporations * * * now owning or operating, or which may hereafter own or operate, any railroad in this state". This definition would include MoPac. Section 388.290, paragraph 1, authorizes the consolidation of two or more railroad companies "in this state" owning railroads "constructed wholly or in part, which, when completed and connected, will form in the whole or in the main one continuous line of railroad". It provides for approval "by a majority in interest of all the stock held in each company". Paragraph 3 reiterates the denial of consolidation authority except when "the continuous line of roads is secured, running in the whole or in the main in the same general direction", and prohibits consolidation where "it will deprive the public of the benefit of competition between said roads". Section 388.300 authorizes a railroad company to "aid" another under specified circumstances and refers to assent thereto by "a majority of the stock of such company".

There immediately arise a number of questions as to the applicability of these chapter 388 statutes, or any of them, to the proposed plan. Some of these impress us as of no real substance. One such is the objection that T&M being already an existing corporation, makes the plan a merger, rather than a consolidation. Another, suggested by Slayton, is that T&M is not a railroad company because it does not now operate a railroad or own one already constructed. We prefer to regard T&M as a tool organized to effect a genuine consolidation and not as

something which, merely because of its present existence, renders the statute inapplicable.

More troublesome is the phrase, "in this state", which MoPac concededly describes as "somewhat obscure". This must refer to something, either the state of incorporation or the location of assets, or business activity. But T&P is not a Missouri corporation and has no railroad properties in Missouri. Further, the requirement of § 388.290 that the consolidated line be a continuous one running in the same direction does not find support in the pleadings here. In addition, the predecessors of chapter 388, viz., Laws of 1869, p. 75, and Laws of 1870, p. 89, were statutes of obviously limited purpose. Finally, we entertain difficulty in discerning any applicability here of § 388.-300.

MoPac and Mississippi of course contend that chapter 388 and its majority vote provisions are applicable. While MoPac concedes that the history of railroad consolidation law in Missouri "is confused", it stresses that no Missouri railroad consolidation statute has ever required a class vote, although such a vote is required when a railroad corporation seeks to alter its capital structure by amendment of its articles. § 388.220, par. 2(3) (c). It also points out that Missouri railroad corporations have consolidated with foreign railroad corporations under chapter 388. State ex rel. Wabash Ry. v. Roach, 267 Mo. 300, 184 S.W. 969 (1916), is cited as one example "in which the Missouri Supreme Court took for granted the propriety of the consolidation under Chapter 388". Our reading of that case, however, see p. 972 of 184 S.W., suggests to us that the consolidation was one made pursuant to the special provisions of § 388.300.

MoPac also points out that "the last great consolidation involving a Missouri railroad", namely, that of the Missouri-Kansas-Texas, was effected through a plan precisely the same in structure as the one here proposed, and that it must have been accomplished under chapter 388 because the two-thirds vote other-

wise required by chapter 351, hereinafter mentioned, was not present. Missouri-Kansas-Texas R. R. Consolidation, 312 I.C.C. 15 (1960). This may well have been the case but the material concerning that consolidation which has been submitted to us does not reveal that it was effected in the face of opposing argument. We do not find the M-K-T example any more persuasive than the contrary suggestion by plaintiff Levin that during the MoPac reorganization the ICC and the district court appear to have assumed that it was chapter 351 which applied to a merger of MoPac and a Louisiana subsidiary. P. 684 of 290 I.C. C. and p. 402 of 129 F.Supp.

We conclude that, despite chapter 388's broad titular application to railroad corporations, it is in fact confined to special situations of a kind different from the proposed plan here. It is, therefore, not "applicable State law", within the scope of § 5(11), so that its majority vote standard would control.

b. V.A.M.S. ch. 351, is entitled "General and Business Corporations". Section 351.690(3) provides that "Only those provisions of this law which supplement the existing laws applicable to railroad corporations * * * and which are not inconsistent with, or in conflict with the purposes of, or are not in derogation or limitation of, such existing laws, shall be applicable to" railroad corporations. If we are correct in our above analysis that chapter 388 is addressed to fact situations different from that of the proposed plan, and if we may assume, as we think we can, that the proposed plan is not one specifically prohibited by chapter 388, see, for example, § 388.290 (3), then § 351.690(3) would seem to indicate that chapter 351 does have application here.

Section 351.458 authorizes merger and consolidation with a foreign corporation. Section 351.420 provides that a plan of consolidation shall be submitted to a vote of the shareholders. Section 351.425 provides that the plan "shall be approved upon receiving the affirmative vote of the holders of at least two-thirds of the outstanding shares entitled to vote at such meeting, of each of such corporations".[5] We note in these cited sections of chapter 351 the absence of any reference to class voting and thus are tempted to conclude that, were these sections alone to be considered, class voting would not be required for a consolidation and that the only necessary vote would be that of two-thirds of all the outstanding voting shares. Moss Estate, Inc. v. Metal & Thermit Corp., 73 N.J.Super. 56, 179 A.2d 54, 62 (Ch. 1962).

But chapter 351 also contains § 351.270, with its provocative provisions.[6] The ultimate issue, then, is whether this section operates to make any class voting provisions of MoPac's Articles applicable to a consolidation plan when the Missouri consolidation statute itself does not impose that requirement. The district court decided this issue in the affirmative, with an unembellished reference to § 351.270, p. 750 of 233 F.Supp.

Mississippi argues that because MoPac's Articles do not provide for class voting on any consolidation, the section cannot apply. It and MoPac also argue that § 351.270's words, "required by this chapter", are important; that they contemplate only the possibility of greater preponderance in voting; that, for example, they permit a requirement of more than the two-thirds vote otherwise specified by § 351.425; that, however, they cannot serve to engraft class voting on a situation where it does not otherwise

---

5. The district court, when approving the fourth MoPac reorganization plan, held that this shareholder approval was not required *before* submission of the plan to the ICC. In re Missouri Pac. R.R., supra, p. 402 of 129 F.Supp.

6. § 351.270. "Whenever with respect to any action to be taken by the stockhold-

ers of a corporation the articles of incorporation require the vote or concurrence of the holders of a greater portion of the shares, or of any class or series thereof, than required by this chapter with respect to such action, the provisions of the articles of incorporation shall control this section."

exist; that, if they did permit this, the Articles would supersede the consolidation statute; that, as a principle, the applicable Missouri statutes are written into every Missouri corporate charter, including MoPac's, citing Shapiro v. Tropicana Lanes, Inc., 371 S.W.2d 237, 241 (Mo.Sup.1963); Federal United Corp. v. Havender, 24 Del.Ch. 318, 11 A.2d 331, 338 (Sup.Ct.1940), and other cases; and that, with respect to similar statutes in other states, no one has suggested the engraftment of class voting upon legislation which merely authorizes articles to provide for greater percentages.

The plaintiffs, singly or together, argue that § 351.425's silence on class voting is not negation; that § 351.055 (3) authorizes classes of shares; that, therefore, class voting as well as percentages may be superimposed upon the voting percentage required by § 351.425; that the appellants' arguments would render meaningless the reference in § 351.-270 to a "series" of shares because chapter 351 nowhere else speaks of a series; that a commentator upon the parallel Illinois statute has reached a conclusion opposite to that espoused by the appellants, Haller, Corporate Control Under the Illinois Business Corporation Act Through Charter and By-Law Provisions, 32 Chi.Bar Rec. 411, 413 (1951); and that it would be bizarre, indeed, to say that § 351.270 permits articles to call for a very high percentage, even all, of the voting shares but at the same time denies class voting.

■ Here, again, we perceive no clear-cut, free-from-doubt and positive answer in these chapter 351 sections to the issue of class voting under Missouri law. We do conclude that the proposed plan is one governed by chapter 351. But we are not prompted to conclude, with any assurance, that the general two-thirds-of-voting-shares standard embraced by § 351.425 is qualified by § 351.270 to the extent that it demands class voting if the articles seem to require it.

c. If, however, it be assumed that § 351.425 and § 351.270 do defer to Mo-Pac's Articles so far as a consolidation is concerned, and if it be further granted that MoPac's Articles call for a class vote on consolidation, two additional questions arise: Are the Articles then "State law", within the meaning of § 5(11)? If so, is class voting then "required" or merely permitted under that state law?

MoPac argues that whatever may be the legal status of the Articles as between MoPac and the State of Missouri, or as among its shareholders, the Articles are not organic law of the state; that the Supreme Court of Missouri has typified a business corporation as a product of private contract and the articles as a contract between the shareholders, Shapiro v. Tropicana Lanes, Inc., supra p. 241 of 371 S.W.2d; that this certainly is not "applicable State law"; and, lastly, that there is an overriding public interest in the MoPac situation. Mississippi buttresses this by arguing that "State law" means statutory law and not common law or the law of contracts. There is authority which supports this approach. Gilliam v. California Employment Stabilization Comm., 130 Cal.App.2d 102, 278 P.2d 528, 536 (1955); Brinckerhoff v. Bostwick, 99 N.Y. 185, 1 N.E. 663, 665 (1885); Board of Educ., etc. v. Town of Greenburgh, 277 N.Y. 193, 13 N.E.2d 768, 770 (1933); Delta County v. City of Gladstone, 305 Mich. 50, 8 N.W.2d 908, 909 (1943); State ex rel. McKittrick v. Missouri Pub. Serv. Comm., 352 Mo. 29, 175 S.W.2d 857, 861 (1943); see Travelers Health Ass'n v. FTC, 298 F.2d 820, 822 (8 Cir. 1962).

The appellees' response is simply that § 351.270 authorizes charter provisions to impose class voting, that the MoPac charter provides for it, and that a class vote is therefore required under applicable state law. This reasoning may find some support in Sellers v. Joseph Bancroft & Sons, 23 Del.Ch. 13, 2 A.2d 108 (Ch. 1938).

■ Even without placing reliance on *Sellers,* we might favor not restricting § 5(11)'s reference to "applicable State law" to statutory material. The appellants' cited cases, which announce the general rule that a statutory reference to "law" does not include the common law, recognize that a different result follows when context so requires. *Greenburgh,* supra, p. 770 of 13 N.E.2d; *Gilliam,* supra, pp. 536–537 of 278 P.2d. We think of no persuasive reason for regarding § 5(11) as distinguishing between a statutory provision for a class vote and a charter provision for it pursuant to statutory authority. Also, the statute speaks of a vote *under,* rather than *by,* state law; "under" does not connote quite so strongly the specification of a statute but, rather, rights and duties measured by law generally. And there is some indication in the ICC regulations for adherence to charter provisions in consolidation proceedings. 49 C.F.R. 352.-3 (1940).

■ Be that as it may, we are driven to the word "required" in § 5(11). "Required" implies something mandatory, not something permitted by agreement. The difference in concept has been judicially recognized. In re Boyd, 213 F. 774, 775–776 (2 Cir. 1914); Huey v. Waldrop, 141 Ala. 318, 37 So. 380 (1904).

■ We conclude that the MoPac Articles and the Missouri railroad and business corporation statutes do not provide material which carries us far enough. In summary, and in repetition: We hold that the proposed plan is one for a "corporate consolidation" and that the parenthetical material of § 5(11) is applicable. We conclude that a majority of all voting shares in the aggregate is the general standard and that the statute bows in the direction of state law only with its phrase beginning with "unless". We also conclude that chapter 351 has application to the proposed plan. But, while there are significant contrary arguments, we are not persuaded either (a) that MoPac's Articles call for a class vote on a consolidation, or (b) that, if

they do, § 351.270, by its reference to the articles, demands a class vote, or (c) that, even if it does, class voting is something "required under applicable State law". In our view, the Class B shareholders must surmount each and all of these hurdles in order to prevail. We are not convinced that they have surmounted any of them. We are impressed with the significance of the national transportation policy and its emphasis on railroad consolidation, with the stated exclusive and plenary character of § 5(11), and with its consequent preemptive nature. All this compels us, when we entertain doubt for the contrary result, as we do here, to resolve that doubt on the side of those provisions of the statute which bespeak the rule and not on the side of those which provide the exceptions.

We take comfort in the fact that, if we err in our conclusions, the Class B shareholders still possess that protection, inherent in § 5(2) (b), which is always available to those affected by Commission action on a consolidation plan, namely, that the plan be consistent with the public interest and just and reasonable, and that it is subject to the usual court review. Our present decision, although adverse to the Class B shareholders, does not deprive them of anything which may properly be presented before the Commission and on such review.

Perhaps we should add a final word about two lines of argument which appear in the respective briefs:

1. Each side asserts that in the past the other has adopted a position not consistent with that now espoused. Collateral estoppel, equitable estoppel, and res judicata are all suggested. We are satisfied that any inconsistency, to the extent it is present at all, is not of such dignity or surrounded with such circumstances as support either estoppel or res judicata. One or more of the accepted essentials for these legal results is absent in each instance.

2. The appellees assert that, in any event, the district court's conclusion was a permissible one upon a doubtful ques-

**120**

tion of state law. The question here, however, is a matter which primarily concerns the interpretation of § 5(11). This is a federal statute. Despite its interplay with the Missouri law, our difference with the district court relates to this statute and the national transportation policy. As a consequence, our perhaps too frequent pronouncement about our unwillingness to override a permissible conclusion reached by an experienced trial judge as to a doubtful question of the law of his state, see Homolla v. Gluck, 248 F.2d 731, 733–734 (8 Cir. 1957), has no persuasive application here.

The order of the district court is reversed and the case remanded.